## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**JAMES DEAN BLOOMER, as the surviving son of James Wright Bloomer and as the Administrator of the ESTATE OF JAMES WRIGHT BLOOMER,**

**Plaintiffs,**

**v.**

**HMG PARK MANOR OF WESTWOOD, LLC, and HMG SERVICES, LLC,**

**Defendants.**

**Case No. 24-2059-JAR**

## MEMORANDUM AND ORDER

Plaintiffs James Dean Bloomer, as the surviving child of decedent James Wright Bloomer; and the Estate of James Wright Bloomer, through James Dean Bloomer Jr. as Administrator of the Estate, bring this diversity action against Defendants HMG Park Manor of Westwood, LLC and HMG Services, LLC. Plaintiffs allege wrongful death and survival claims under Kansas law arising out of decedent James Wright Bloomer's treatment at a skilled nursing facility, HMG Park Manor of Westwood, LLC d/b/a Tanglewood Nursing and Rehabilitation ("Tanglewood"), located in Topeka, Kansas. Before the Court is Defendant HMG Services, LLC's Motion for Summary Judgment (Doc. 56). The motion is ripe for decision, and the Court is prepared to rule. For the reasons explained below, the motion for summary judgment is denied.

## I. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. In applying this standard, a court views the evidence and all reasonable inferences therefrom in the

light most favorable to the nonmoving party.[1]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[2]  "A fact is material if under the substantive law it is essential to the proper disposition of the claim."[3]  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[4]

The moving party must initially show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[5]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[6]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[7]  The nonmoving party may not simply rest upon its pleadings to satisfy this burden.[8]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a

---

[1] *City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[2] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[3] *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 882 (10th Cir. 2015) (quoting *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001)).

[4] *Thomas v. Metro. Life Ins.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[5] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[6] *Adams v. Am. Guar. & Liab. Ins.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[7] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Celotex*, 477 U.S. at 324.

[8] *Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

rational trier of fact could find for the nonmovant."[9]  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript[,] or a specific exhibit incorporated therein."[10]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[11]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[12]

## II.    Uncontroverted Facts

The following material facts are either uncontroverted, stipulated to, or viewed in the light most favorable to Plaintiffs.[13]

Defendant HMG Park Manor of Westwood LLC d/b/a Tanglewood Nursing and Rehabilitation ("Tanglewood") is a skilled nursing facility located in Topeka, Kansas. Tanglewood admitted James Wright Bloomer on February 8, 2022, under the care of Dr. James Rider.  Mr. Bloomer was later admitted to Stormont Vail Hospital on April 8, 2022, and then discharged to Plaza West Regional Health Center on April 21, 2022.  At 16:45 on April 22, 2022, Mr. Bloomer passed away.  Plaintiffs in this case allege that both Defendants Tanglewood

---

[9] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 670–71); *see also Kannady*, 590 F.3d at 1169.

[10] *Adams*, 233 F.3d at 1246 (quoting *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.3d 1022, 1024 (10th Cir. 1992)).

[11] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[12] *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

[13] Plaintiffs' brief in opposition to summary judgment is out of compliance with several local rules. Plaintiffs' counsel is directed to review the local rules for future compliance, specifically D. Kan. Rule 5.1(a) ("Pleadings, motions, briefs, and other papers submitted for filing must be . . . double-spaced, in no less than 12-point font."); Rule 7.1(d)(2) (providing 40-page limit to principal briefs in support of or in response to summary judgment); and Rule 56.1(b) (setting forth requirements for briefs opposing summary judgment).

and HMG Services, LLC ("HMG Services") breached the following duties of care to Mr. Bloomer: (1) admitting Mr. Bloomer when they knew Tanglewood could not meet his needs; (2) failing to provide accurate and timely assessments; (3) failing to update the care plan; (4) failing to notify the physician that Mr. Bloomer's catheter was leaking and changed three times; and (5) failing to provide an additional registered nurse for each shift on April 1–4, and April 5–8. Plaintiffs claim that Mr. Bloomer's death was proximately caused by Defendants' breach of these duties.

At all relevant times, Tanglewood, a Texas limited liability company, was the licensed operator of the facility. HMG Services is also a Texas limited liability company and a separate legal entity that entered into a Consulting Agreement with Tanglewood, effective June 1, 2014, whereby Tanglewood was named the "Operator" and HMG Services was named the "Consultant." It specifies:

> Operator is the operator of a 54 bed nursing home located at 5015 SW 28th Street, Topeka, Shawnee County, Kansas 66614, known as Westwood Manor, together with the equipment, furnishings, and other tangible personal property used in connection therewith (the "Facility"); and,

> Operator wishes to retain the services of Consultant to provide advice and related services regarding the operation of the Facility as set forth in greater detail in the remainder of this Agreement.

> Consultant is willing to perform such services with regard to providing consulting services, information and materials services for the Facility (the "Consulting Services"), upon the terms and subject to the conditions contained herein.

> In consideration of the foregoing and of the full and faithful performance of all the terms, conditions, and obligations herein contained and intending to be legally bound hereby, Operator and Consultant agree as follows . . . . [14]

---

[14] Doc. 57-1 at 2.

The Agreement then includes a series of provisions, including the parties' respective duties. One key provision is the following:

> 1.2. Control Retained by Operator. Operator, acting by and through its duly authorized officers, shall at all times retain and exercise control over the assets and operations of the Facility, and Consultant shall perform the functions and duties described in this Agreement to be performed by it in accordance with policies and directives from time to time adopted by Operator. It is expressly agreed by Operator and Consultant that Consultant is at all times acting and performing as an independent contractor. Except as otherwise expressly provided in this Agreement, nothing contained herein shall constitute or be construed to be or create a partnership, joint venture, employment relationship, or principal and agent relationship between Operator, its successors and assigns on the one part, and Consultant, its successors and assigns on the other part. Furthermore, Consultant is not assuming any of the debts, obligations, duties or liabilities of Operator relating to the Facility. Whenever this Agreement calls for the approval of Operator, such approval shall not be unreasonably withheld or delayed. In the absence of timely approval or other specific directions from Operator, Consultant shall be entitled to rely upon its reasonable business judgment in fulfilling its management responsibilities hereunder.[15]

The Consulting Agreement is signed by Laurence C. Daspit on behalf of both parties to the Agreement—as the CEO of Tanglewood and the CFO of HMG Services.

The parties highlight different contractual provisions to support their respective positions on the motion for summary judgment, but neither party disputes the authenticity or language of the Agreement, and they stipulated to its admissibility for purposes of summary judgment.[16] The Court will refer to and quote from the relevant provisions of the Agreement in its rulings below.

---

[15] Doc. 57-1 § 1.2.

[16] Doc. 54 at 3. Plaintiffs' attempts to deem facts disputed that quote directly from the Consulting Agreement are therefore unavailing.

In addition, Plaintiffs introduce evidence about Defendants' business relationship in practice. Defendant did not file a reply, so to the extent Plaintiffs' statements of additional facts are supported by the record, the Court considers them undisputed.[17]

Hannah Culp was the Administrator at Tanglewood in 2021 and early 2022. Culp understood that her supervisor was Kendal Kappeler, who worked for HMG Services. Culp testified at her deposition that in her role as Administrator, she "would reach out to [Kappeler] if I needed any advice or assistance."[18]

Connor Bigham was the Director of Business Development at Tanglewood when Culp was Administrator. In that role, Bigham worked with hospitals and case managers to bring in referrals to the Tanglewood facility and helped with the admissions process for those new residents. After Culp left, Bigham eventually became Administrator at Tanglewood. Like Culp, he understood that Keppeler was his supervisor.

HMG Services maintained a network of regional specialists who were involved in Tanglewood's operations, including a regional business office, a regional nurse consultant, and a regional consultant for administrators. Tanglewood staff referred to HMG Services personnel as "our regional." HMG Services made personnel transfer decisions between facilities, including Tanglewood. For example, Culp previously worked at another facility that was sold, and she was transferred to Tanglewood. Keppeler contacted her and informed her of the decision and Culp was transferred without an interview. HMG Services also provided a recruiter to Tanglewood and took part in the interview process for Tanglewood personnel. HMG Services personnel visited Tanglewood to review operations, and it provided training and training

---

[17] *See* Fed. R. Civ. P. 56(e)(2).

[18] Doc. 59-2 at 13:16–19.

materials to Tanglewood's staff.  HMG Services directly trained Tanglewood's nursing leadership in Texas, where it was based.

HMG Services provided Tanglewood with the policies and procedures that the facility must follow, although Tanglewood was permitted to make changes if needed to make it specific to that facility.  HMG Services' personnel participated in Tanglewood's budget process, and when Culp was Administrator of Tanglewood, she was required to obtain approval from Keppeler for any budget changes.  Purchases were made through HMG Services and Bigham testified at his deposition that, as Administrator, he did not have access to a check book for the facility.

Tanglewood provided its employees with an Employee Handbook.  Among other provisions, it established a corporate appeals process.  After an appeal to the Administrator, if the employee "feel[s] that your request to the Administrator is unresolved, you may contact in writing to the Chief Operating Officer, 4 Waterway Square Place, Suite 350, The Woodlands, TX, 77380."[19]  It also stated that termination from Tanglewood meant termination from "all other related Tanglewood Health & Rehabilitation facilities."[20]  The Handbook likewise requires the "Chief Operating Officer" to approve any request from the Administrator for employee reimbursement under the Education Reimbursement Plan.[21]

HMG Services had no contracts with Mr. Bloomer or with any of his legal representatives.  No HMG Services employees ever provided care or treatment to Mr. Bloomer.

---

[19] Doc. 59-5 § 10.6.

[20] *Id.* § 10.5.

[21] *Id.* § 13.1.6.  Plaintiffs include several other provisions of the Employee Handbooks in their Statement of Additional Facts, but the Court finds that they are not material to the joint venture analysis because they do not reference, nor can the Court reasonably infer that they reference, HMG Services.  *See id.* §§ 4.3, 19.1, 19.6, 19.7.

### III.    Discussion

HMG Services moves for summary judgment, arguing that it cannot be liable as a matter of law on Plaintiffs' wrongful death and survival claims because it is a separate entity from Tanglewood that did not owe a duty of care to Mr. Bloomer.  Plaintiffs respond by moving to exclude certain statements in the declarations attached to Defendant's motion, and by arguing that HMG Services' affirmative undertakings created a duty of care to Mr. Bloomer, or, alternatively that Defendants were part of a joint venture that created shared liability for the negligent care of Mr. Bloomer.  The Court first addresses Plaintiffs' objections to HMG Services' declarations and then considers the issue of HMG Services' duty of care to Mr. Bloomer.

### A.    Plaintiffs' Evidentiary Objections

Plaintiffs argue that statements in Patti Harrison's and Conner Bigham's declarations, which HMG Services submitted in support of its motion for summary judgment, should be disregarded under the "sham affidavit" rule.  Under Tenth Circuit law, the Court may disregard an affidavit that is contrary to a prior sworn statement if it creates a "sham fact issue" under the following three-part test:

> (1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain.[22]

Despite labeling them as such, not all of Plaintiff's grounds for exclusion are based on the sham affidavit rule.  Plaintiff also argues that Harrison makes assertions that go beyond her

---

[22] *Gabaldon v. N.M. State Police*, 139 F.4th 1207, 1211 (10th Cir. 2025) (quoting *Law Co. v. Mohawk Constr. & Supply Co.*, 577 F.3d 1164, 1169 (10th Cir. 2009)).

personal knowledge, a wholly different evidentiary issue.  The Court considers the personal

knowledge objections first and then proceeds to consider the sham affidavit rule as applied to the

declarants' statements identified by Plaintiffs.

### 1.    Personal Knowledge

Plaintiffs contend that Harrison lacks personal knowledge to assert in paragraph 13 of her

declaration that

> [t]he Administrator of the Facility was responsible for making all
> decisions regarding the day-to-day operations of the Facility.  The
> Administrator of the Facility was also responsible for overseeing
> the Director of Nursing, who with the oversight of the
> Administrator, was responsible for making all decisions regarding
> the day-to-day clinical operations of the Facility, including resident
> care.[23]

Plaintiffs also argue that Harrison lacks personal knowledge for the statement in paragraph 17

that "Kendal Kappeler never served as the 'supervisor' of any Administrator or any other

employee of the Tanglewood Facility."[24]

Summary judgment evidence need not be "submitted 'in a form that would be admissible

at trial.'"[25]  But "the content or substance of the evidence must be admissible."[26]  "The

requirement is that the party submitting the evidence show that it will be possible to put the

information, the substance or content of the evidence, into an admissible form."[27]  Under Fed. R.

Evid. 602, Harrison "may testify to a matter only if evidence is introduced sufficient to support a

---

[23] Doc. 57-2 ¶ 13.

[24] *Id.* ¶ 17.

[25] *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) (quoting *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006)).

[26] *Id.* (quoting *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006)).

[27] *Id.* at 1232 (quoting 11 Moore's Federal Practice § 56.91 (3d ed. 2015)); *see O'Connor v. Williams*, 640 F. App'x 747, 750 (10th Cir. 2016).

finding that the witness has personal knowledge of the matter." The witness's own testimony can provide evidence of personal knowledge.[28]

At all times relevant to the lawsuit, Harrison was the "V.P. of Support Services of HMG Services."[29] She states in her declaration:

> I make this Declaration based upon my personal knowledge and upon my personal knowledge of the business records of HMG Services, LLC. Those records are made in the ordinary course of HMG Services, LLC's regularly conducted business activities. It is the regular practice of HMG Services, LLC to make and maintain such records. I routinely rely upon such records in the usual course of my business activities, and I have found them to be reliable and accurate.[30]

Thus, Harrison's own declaration provides evidence of her personal knowledge about the organizational structure of the two businesses, and the duties and roles of Tanglewood's Administrator. To the extent Harrison's statements conflict with Plaintiffs' evidence on the organizational structure of HMG Services, it goes to the weight and not the admissibility of the testimony. The Court thus denies Plaintiffs' motion to exclude paragraphs 13 and 17 of the Harrison Declaration under Rule 602.

### 2.    Sham Issues of Fact

Next, Plaintiffs ask the Court to disregard several statements in the Harrison and Bigham Declarations on the basis that they conflict with either their own prior sworn testimony, or other evidence in the record. Plaintiffs overstate the scope of the sham affidavit rule. The rule may apply when an affidavit "conflicts *with the affiant's* prior sworn statements."[31] Thus, to the

---

[28] *See* Fed. R. Evid. 602.

[29] Doc. 57-2 ¶ 3.

[30] *Id.* ¶ 5.

[31] *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986); *see also Knitter v. Corvias Mil. Living, LLC*, 758 F.3d 1214, 1218 n.3 (10th Cir. 2014).

extent Plaintiffs ask the Court to disregard statements in Harrison's declaration because they are contradicted by Bigham's deposition testimony, the motion is denied. This type of conflict does not fall within the purview of the sham affidavit rule. Again, it goes to the weight and not the admissibility of Harrison's statements.

As for Bigham's declaration, Plaintiffs also claim that several of his assertions conflict with his own prior sworn testimony. To the extent there is a direct contradiction, the sham affidavit rule may apply.[32] Thus, before the Court applies the three-factor test, it must consider whether there are direct contradictions between the assertions identified in Bigham's Declaration and his prior sworn statements.

### a. Whether Keppeler was Bigham's Supervisor

Bigham states in paragraph 8 of his declaration: "Ms. Kappeler provided consulting and recommendations regarding operations at the Facility, but as the Administrator of the Facility, I had final decision-making authority over the Facility's operations."[33] Bigham then lists in separate subparagraphs about the specific operations over which he had responsibility.[34] Under "Supervisory Structure," he attests that "[t]he consultants provided by HMG Services, LLC were resources which were available to me (and my Director of Nursing) to assist me in making day to day decisions regarding the operation of the Facility."[35] Plaintiffs contrast these statements with Bigham's response to the question at his deposition, "Who is your direct supervisor when you were Administrator at Tanglewood?" Bigham testified that his "supervisor would have been

---

[32] *See, e.g.*, *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 956 n.3 (10th Cir. 2012) ("To be disregarded as a sham, an affidavit must contradict prior sworn statements.").

[33] Doc. 57-3 ¶ 8.

[34] *Id.* ¶¶ 8.a–8.i.

[35] *Id.* ¶ 8.c.

Kendall [Keppeler]."[36]

Bigham's declaration does not directly contradict his prior deposition testimony that Keppeler was his supervisor. At no point in his declaration does he state that Keppeler was not his supervisor. And his deposition testimony, when read in context, is consistent with his declaration. Just before the supervisor question, Bigham was asked what Keppeler's job was. He responded that "[s]he oversaw several buildings and would give guidance and see if I reached out and had any issues. She also conducted some training as well when I was there."[37] This statement is entirely consistent with paragraph 8 of Bigham's declaration. To the extent Plaintiffs want to argue that Bigham's identification in his deposition of Keppeler as his supervisor is evidence of HMG Services' supervisory control, they may do so. But the Court declines to exclude this paragraph of Bigham's declaration under the sham affidavit rule because it does not directly conflict with his prior deposition testimony.

### b. Financial Control

Next, Plaintiffs ask the Court to disregard paragraph 8.c. of Bigham's declaration, which states:

> Financial Control. As the Administrator of the Facility, I was aware of all Facility receivables and approved all Facility payables. HMG Services provided accounting and billing services for the Tanglewood Facility and maintained financial accounts and records on behalf of the Facility and as a service to me as the Administrator to assist me with the day-to-day operations of the Facility.[38]

Plaintiffs contrast this with the following deposition testimony:

> Q.    Did you have a checkbook that you had access to, as Administrator of Tanglewood?

---

[36] Doc. 59-1 at 19:20–23.

[37] *Id.* at 19:13–19.

[38] Doc. 57-3 ¶ 8.b.

12

A.      Not that I was aware of.

Q.      So you couldn't go write checks to pay for an item that the facility requires; is that right?

A.      To my knowledge, no, I did not.

Q.      And, I mean, there was nobody above you at Tanglewood; correct?

A.      Correct.

Q.      So if there was a purchase that needed to be made, it needed to be made through HMG Services; is that right?

A.      Correct, yes.  I would assume.

Q.      Well, you couldn't do it, so, and there was nobody else at the facility that was above you; right?

A.      Correct.[39]

Again, the Court does not find a direct contradiction that triggers the sham affidavit rule. While Bigham previously denied having access to a checkbook as the Tanglewood Administrator, he asserts something different in his declaration—that he was aware of the facility's receivables and that he approved payables.  He also states in his declaration that HMG Services provided the accounting and billing services for Tanglewood, and maintained its records.  This second part of paragraph 8.b., which Plaintiffs fail to include or acknowledge, is consistent with Bigham's deposition testimony.  These statements do not directly contradict one another; thus, the Court declines to disregard them under the sham affidavit rule.

### c.  Policies and Procedures

Finally, Plaintiffs ask the Court to exclude Bigham's statement in paragraph 8.a that "[a]s

---

[39] Doc. 59-1 at 34:4–21.

the Administrator of the Facility, it was my responsibility to implement policies and procedures and train Facility employees on policies and procedures."[40]  They argue that this statement is inconsistent with Bigham's deposition testimony about who drafted Tanglewood's policies and procedures: "HMG Services would—the policies and procedures, most—all of them were in place when I did become Administrator, but we had a process with the HMG Services would send them to us, and then we would review and make changes, if we needed to, to specify it to the building."[41]

Again, Plaintiffs fail to acknowledge or discuss the entire statement in Bigham's declaration.  After the first sentence, quoted by Plaintiffs, Bigham stated, consistent with his deposition testimony, that "[s]ome policies and procedures were in place at the facility before my tenure as Administrator," and that "HMG Services consultants provided draft proposed policies and procedures for the Facility, which the Facility was able to accept, reject, modify, and if accepted, implement according to the needs of the Facility."[42]  The Court does not find that this statement directly contradicts Bigham's deposition testimony and thus, declines to apply the sham affidavit rule.

In sum, the Court finds no grounds to exclude or disregard the statements identified by Plaintiffs in the Harrison or Bigham Declarations.  Because the Court does not find that the sham affidavit applies to any of Plaintiffs' purported inconsistencies, it need not reach the issue of whether sanctions are appropriate.

---

[40] Doc. 57-3 ¶ 8.a.

[41] Doc. 59-1 at 23:8–20.

[42] Doc. 57-3 ¶ 8.a.

**B.      Duty of Care**

In this diversity action, the Court applies state substantive law and federal procedural law.[43]  The parties agree that Kansas substantive law applies.  To demonstrate wrongful death under Kansas law, Plaintiff must demonstrate "the existence of a duty, a breach of that duty, an injury, and proximate cause, which means a causal connection between the duty breached and the injury."[44]  "[T]he existence of a legal duty is a question of law while breach, causation, and damages are questions of fact."[45]  Therefore, "[i]f a court concludes that a defendant accused of negligence did not have a duty to act in a certain manner toward the plaintiff, then a court may grant summary judgment because the existence of duty is a question of law."[46]

Under Kansas law "[a]s a general rule, the proprietors of a nursing home are under a duty to exercise reasonable care to avoid injuries to patients, and the reasonableness of such care is to be assessed in the light of the patient's physical and mental condition."[47]  HMG Services asks the Court to grant summary judgment in its favor because, as a matter of law, it did not owe Mr. Bloomer a legal duty of care since it did not treat Mr. Bloomer or enter into a contract with him. It maintains that it was merely a consultant to Tanglewood, which was the entity that actually provided Mr. Bloomer's care.  HMG Services contends that under the Consulting Agreement it only provided administrative support and consulting services to Tanglewood; the operational management and day-to-day care were controlled by Tanglewood alone.

---

[43] *Racher v. Westlake Nursing Home Ltd. P'ship*, 871 F.3d 1152, 1162 (10th Cir. 2017).

[44] *Hale v. Brown*, 197 P.3d 438, 440 (Kan. 2008).

[45] *Granados v. Wilson*, 523 P.3d 501, 510 (Kan. 2023).

[46] *Corazzin v. Edward D. Jones & Co.*, 530 P.3d 445, 449 (Kan. Ct. App. 2023)

[47] *Tudor v. Wheatland Nursing L.L.C.*, 214 P.3d 1217, 1222 (Kan. Ct. App. 2009) (quoting *Juhnke v. Evangelical Lutheran Good Samaritan Soc'y*, 634 P.2d 1132, 1136 (1981)).

Plaintiffs respond that HMG Services controlled the operational aspects of Tanglewood, which constituted an affirmative undertaking that included assuming of a duty of care to those who might foreseeably be harmed by its negligent operation of the facility. Plaintiffs further argue that the Tanglewood facility was a joint venture for both Defendants; thus, HMG Services owed Mr. Bloomer a duty of care as part of that joint venture along with Tanglewood. The Court addresses each theory of liability below.

### 1. Affirmative Undertaking

Plaintiffs first argue that when all reasonable inferences are drawn in their favor, the evidence shows that HMG Services controlled several aspects of Tanglewood's operations that impacted resident care, including Mr. Bloomer's, which triggered a duty to perform with due care. Plaintiffs maintain that these aspects of control constituted an affirmative undertaking that triggered a duty owed by HMG Services to Mr. Bloomer under §§ 323 and 324A of the Restatement (Second) of Torts.

Under the Restatement (Second) of Torts § 323,

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
>> (a) his failure to exercise such care increases the risk of such harm, or
>>
>> (b) the harm is suffered because of the other's reliance upon the undertaking.

And under § 324A,

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to

the third person for physical harm resulting from his failure to
exercise reasonable care to protect his undertaking, if

    (a) his failure to exercise reasonable care increases the risk
       of such harm, or

    (b) he has undertaken to perform a duty owed by the other
       to the third person, or

    (c) the harm is suffered because of reliance of the other or
       the third person upon the undertaking.

With respect to the undertaking language in both Restatement provisions, "a defendant's agreement or affirmative act indicating a willingness to provide services is a threshold requirement for such a duty to arise."[48]

     The parties heavily dispute the degree of HMG Services' control over Tanglewood's: (1) policies and procedures; (2) training; (3) clinical oversight and evaluation; (4) personnel decisions; (5) finances; and (6) compliance with federal, state, and local laws and regulations. HMG Services focuses on the language in the Consulting Agreement and in its Declarations disclaiming operational control. It maintains that under the Agreement and in practice, Tanglewood's administrator had the final say on all of these issues and retained control. Plaintiffs focus on deposition testimony from Tanglewood employees that they claim show control by HMG Services.

     The Court first looks to the parties' agreement, which explicitly provides that control is retained by Tanglewood. Section 1.2 of the Agreement makes clear that HMG Services "is at all times performing as an independent contractor," and that unless otherwise provided in the agreement, HMG Services "is not assuming any of the . . . duties . . . of [Tanglewood] relating to

---

[48] *Cunningham v. Braum's Ice Cream & Dairy Stores*, 80 P.3d 35, 42 (Kan. 2003).

the Facility."[49]  There is no genuine issue of material fact that the parties' agreement does not

indicate a willingness to provide services that created a duty.  Thus, the Court proceeds to

consider whether there were affirmative acts by HMG Services that constitute a willingness to

provide services to Tanglewood patients like Mr. Bloomer.

       In terms of the facility's policies and procedures, the parties' agreement provides that

HMG Services "shall provide for [Tanglewood's] approval policies and procedures manuals for

the operations of the Facility (the "Facility Manuals")."[50]  Consistent with this provision,

Bigham testified at his deposition that "HMG Services would—the policies and procedures,

most—all of them were in place when I did become Administrator, but we had a process with the

HMG Services would send them to us, and then we would review and make changes, if we

needed to, to specify it to the building."[51]  According to Plaintiffs, because these policies

impacted resident safety, HMG Services had a duty to ensure that the policies adequately

protected residents.  The record on summary judgment makes clear that while HMG Services

provided policies and procedures to Tanglewood, Tanglewood could and did make changes to

them when necessary.  But neither party discuss which policies are at issue in this case.  At the

very least, according to the Pretrial Order, Plaintiffs maintain that there was a breach of duty

involving Tanglewood's admissions policy.

       It is undisputed that HMG Services provided training and training materials to

Tanglewood's staff, including by providing "licensed nursing personnel to assist in the

evaluation of the Facility's nursing staff in its provision of treatment and care to the Facility's

---

[49] Doc. 57-1 § 1.2.

[50] *Id.* § 2.2.

[51] Doc. 59-1 at 23:8–20.

residents."[52]  Bigham states that HMG Services provided assistance with training and training

resources" based on policies that both preceded him and that he put in place as Administrator.  It

is undisputed that HMG Services directly trained Tanglewood's nursing leadership in Texas,

where it was based.  And the degree and quality of HMG's training is directly tied to the duties

identified by Plaintiffs in this lawsuit.  If HMG Services' training in any of these areas fell short,

it would have impacted the quality of care by Tanglewood nurses in terms of: (1) admissions ;

(2) assessments; (3) when to update a care plan; (4) when to notify a physician regarding catheter

leakage; and (5) staffing levels.

 Thus, notwithstanding the disclaimer language in the parties' Consulting Agreement,

Plaintiff has come forward with evidence of an affirmative undertaking by HMG Services that

could give rise to the duties identified in the Pretrial Order based on its participation in crafting

policies and procedures for Tanglewood, and its training of nursing leadership and provision of

training materials.

 The parties both discuss this Court's 2017 decision in *Miller v. NEP Group., Inc.*, where

it considered whether the defendants' parent-subsidiary relationship was sufficient to establish

liability to an employee by the parent for unsafe working conditions at the subsidiary.[53]  This

Court determined under the facts of that case that there was no duty because the evidence only

showed that the parent company "provided general safety materials to all of its subsidiaries.  A

duty is not proved by conduct consistent with an intention solely or primarily to serve the

parent's own purposes."[54]

 While Defendant is correct that this limited discussion supports its contention that merely

---

[52] Doc. 57-1 § 2.4.

[53] *Miller v. NEP Grp., Inc.*, No. 15-CV9701-JAR, 2017 WL 2151843, at *7–8 (D. Kan. May 17, 2017).

[54] *Id.* at *8.

providing policies and procedures to Tanglewood was not sufficient to show an affirmative undertaking for purposes of negligence, there are important distinctions. First, *Miller* considered the issue of duty by a parent company to provide safe working conditions for its subsidiary's employees. Here, the Court must consider whether HMG Services, an independent contractor, exercises sufficient control over the operational aspects of Tanglewood that it created a duty to Tanglewood's patients. Second, Plaintiffs do not solely rely on HMG Services' provision of safety materials as an affirmative undertaking that triggered a duty of care. They submit evidence that HMG Services controlled training Tanglewood's nursing staff on these policies. Plaintiffs also come forward with evidence that HMG Services exhibited control in many other areas, including finances, regulatory compliance, hiring decisions, and clinical oversight. Indeed, the same individual signed the consulting agreement on behalf of both parties. Thus, *Miller* is highly distinguishable and does not control here.

Plaintiffs rely on several Kansas cases construing Restatement (Second) of Torts §§ 323 and 324A in the context of premises liability for weather-related events. In *Sal v. T's, Inc.*, the Kansas Supreme Court considered whether a golf course owed a duty to its patrons to protect from the harms of a lightning strike on its premises.[55] The court determined that the golf course had a safety policy of using an air horn to signal to golfers to return to the clubhouse in inclement weather; thus, under § 323 it "owed a duty of reasonable care to its patrons to utilize it correctly."[56]

The Kansas Supreme Court reached a different result in *Cunningham v. Braum's Ice Cream & Dairy Stores*.[57] There, the court "decline[d] to extend Kansas law" to find that "a

---

[55] 136 P.3d 471, 475 (Kan. 2006).

[56] *Id.* at 482.

[57] 80 P.3d 35 (Kan. 2003).

business proprietor has a duty to warn and shelter patrons from severe weather they may encounter on their journey home from the proprietor's premises."[58]  The court determined that although the defendant had an internal emergency action plan that applied to its employees' actions when a tornado is sighted or warning sirens can be heard in the store, that plan only required employees to make its milk room available to patrons; they may elect to leave if they wish.[59]  This internal emergency action plan was not sufficient to constitute an affirmative undertaking that triggered a duty to protect from severe weather on the patrons' way home.[60]

The Court does not find these weather-warning cases particularly helpful in this nursing home context.  Importantly, in those cases, the scope of the defendant's internal policy informed the scope of the duty involved.  While there is certainly evidence in this record that HMG Services was involved in creating Tanglewood's policies and procedures, the substance and scope of those policies and procedures are not in the record here or relied on by Plaintiffs as triggering an affirmative duty to care for Mr. Bloomer in a particular way.  Instead, Plaintiffs maintain that HMG Services' overarching role in the operation of the facility, including but not limited to drafting policies and procedures, gave rise to its duty of care in this case.  Given this important distinction, the Court finds more instructive the Superior Court of Pennsylvania's decision in *Scampone v. Grane Healthcare Co.*,[61] which considered whether a nursing home management company owed a duty of care to the plaintiff—a nursing home resident—under the Restatement (Second) of Torts §§ 323 or 324A.

The court in *Scampone* found that the plaintiff brought forward evidence that established

---

[58] *Id.* at 39–40.

[59] *Id.* at 43.

[60] *Id.*

[61] 169 A.3d 600 (Pa. Super. Ct. 2017).

a duty of care by Grane, the nursing home's parent company, under both §§ 323 and 324A.[62]   It

reached this conclusion based on the following evidence: (1) the management agreement

between the facility and Grane "required Grane to manage all aspects of the operation of [the

facility], establish and administer a quality assurance program, and ensure that the nursing home

facility provided quality nursing services to its residents"; (2) the record showed that Grane hired

and trained all of the nurses and a Grane nurse visited the facility every week "and directly

oversaw patient care delivered at the facility"; (3) "Grane created and disseminated the policies

and procedures for the nursing home facility, and it approved the budget"; and (4) a Grane

employee supervised the facility's Administrator.[63]   Given these facts, the court determined that

"Grane contractually undertook to render services to residents of Highland's nursing home by

managing the care provided to them and by overseeing the operations of the facility."[64]   And the

court also determined that a duty was created under § 324A because Grane "should have

recognized that its contractual undertaking to manage and oversee the care and treatment of [the

patient] was necessary for [the patient's] protection."[65]

　　There are both similarities and differences between the record here and in *Scampone*.

The record here, when viewed in the light most favorable to Plaintiffs, does not reflect that HMG

Services manages all operations of the facility.  And, unlike *Scampone*, HMG Services did not

contractually undertake provision of patient care.  In fact, the Consulting Agreement specifically

provides that Tanglewood is the "Operator" that operates the facility, while HMG Services

---

[62] *Id.* at 618–19.

[63] *Id.* at 618.

[64] *Id.* at 619.

[65] *Id.*

"provides advice and related services regarding the operation of the Facility."[66]  The contract also makes clear in section 1.2 that control is retained by Tanglewood.

Nonetheless, there is evidence that HMG Services undertook managing and overseeing patient care in practice.  It provides at least the default policies and procedures for the facility, and is responsible for training nursing leadership and providing training materials.  There is evidence that HMG Services made hiring decisions, including for the Administrator.  While there is a dispute of fact about whether Keppeler was in fact the Administrator's supervisor, it is undisputed that both Bigham and Culp at least understood her to be their supervisor and considered her a resource when issues arose at the Facility.  Indeed, the same individual signed the Consulting Agreement on behalf of both parties.  Thus, the Court finds that the Consulting Agreement, combined with HMG Services' affirmative acts of promulgating policies and procedures and training the nursing staff at Tanglewood, gave rise to a duty to execute those activities with due care.

HMG Services relies on *Scampone* for a different proposition: that any duty of care in this case was owed by Tanglewood only.  HMG Services appears to misunderstand how *Scampone* applies to the limited issue before the Court (as raised by HMG Services in its opening, and only, brief in support of summary judgment): whether HMG Services owed a duty of care to Mr. Bloomer.[67]  On that point, as explained above, the *Scampone* court concluded that under the Restatement (Second) § 323 and 324A, the parent company owed a duty of care to the patient.  The next question was whether the parent company owed this duty of care in direct

---

[66] Doc. 57-1 at 1.

[67] In fact, HMG Services discusses this case in the section of its brief on joint venture liability.  Doc. 57 at 10–14.  The *Scampone* decision does not address a joint venture theory of liability.  Nonetheless, the Court considers its argument in the context of the affirmative undertaking liability theory.

corporate liability, and if so, which entity was liable since that duty would be non-delegable.[68]

Ultimately the court determined that while the duty was indeed non-delegable in terms of direct

corporate liability, Grane could be vicariously liable:

> The fact that Highland was liable in direct corporate negligence for Grane's alleged misfeasance does not serve to absolve Grane from the duty of care it assumed by virtue of § 323 and § 324A. Grane remains exposed to liability in this case because, according to Mr. Scampone's proof, its employees did not perform Grane's duty in a reasonable manner, increasing the risk of the harm actually suffered by Madeline. Madeline certainly relied upon Grane's undertaking to manage the facility to ensure proper patient care, whether or not she knew that Highland had assigned the responsibility for overseeing patient care to Grane.
>
> When returning this case back to the middle of trial in the nonsuit phase, the trial court incorrectly focused solely on the issue of direct corporate liability against Grane and Highland. While, under *Scampone II*, both entities cannot have direct corporate liability for performance of the same non-delegable duty imposed by *Thompson*, resolution of that singular question did not impact on the question of whether Grane was subject to vicarious liability herein.[69]

Here, neither party clearly raises or briefs the issue of direct versus vicarious liability, and the

Court declines to consider that separate issue sua sponte. On the limited issue raised in HMG

Services' motion for summary judgment, the Court finds that Plaintiffs have come forward with

sufficient evidence that HMG Services owed a duty of care under the Restatement (Second) of

Torts §§ 323 or 324A to Mr. Bloomer.

### 2. Joint Venture

Alternatively, Plaintiffs argue that the facility was a joint venture with both Defendants,

triggering a duty of care. Under Kansas law, a joint venture is "an association of two or more

---

[68] *Scampone*, 169 A.3d at 609.

[69] *Id.* at 622.

persons or corporations to carry out a single business enterprise for profit."[70]  A joint venture

may be formed "from express contractual provisions or out of acts and conduct."[71]  However,

"[D]efendants cannot preclude the existence of a joint venture 'simply by disclaiming it in

writing.'"[72]  Instead, the Court considers whether a joint venture exists based on the following

factors:

> (1) the joint ownership and control of property; (2) the sharing of
> expenses, profits, and losses, and having and exercising some
> voice in determining the division of net earnings; (3) a community
> of control over and active participation in the management and
> direction of the business enterprise; (4) the intention of the parties,
> express or implied; and (5) the fixing of salaries by joint
> agreement.[73]

The law is clear that HMG Services cannot stand on the disclaimer in the Consulting

Agreement to preclude the existence of a joint venture.  And HMG Services provides no analysis

about these factors beyond referencing the disclaimers in the Consulting Agreement, and

statements in Harrison's and Bigham's declarations that are controverted.  The Court has

examined the relevant factors and finds genuine issues of material fact about several of the joint

venture factors that preclude entry of summary judgment in favor of HMG Services.

First, joint ownership and control is at issue.  Under Kansas law, "ownership of a

business enterprise does not require legal title or exclusivity of ownership interests."[74]

Moreover, "[o]wnership does not necessarily mean absolute dominion over the subject property.

---

[70] *Underground Vaults & Storage, Inc. v. Cintas Corp.*, 632 F. App'x 917, 921 (10th Cir. 2015) (quoting *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*, 596 P.2d 816, 821 (Kan. 1979)).

[71] *Terra Venture, Inc. v. JDN Real Est. Overland Park, L.P.*, 443 F.3d 1240, 1245 (10th Cir. 2006) (quoting *Opco, Inc. v. Scott*, 321 F.2d 471, 473 (10th Cir. 1963)).

[72] *Keller v. Diversicare of Council Grove, LLC*, No. 23-2556-ADM, 2025 WL 764639, at *5 (D. Kan. Mar. 11, 2025) (quoting *Cargill Meat Sols. Corp. v. Premium Beef Feeders, LLC*, 168 F. Supp. 3d 1334, 1340 (D. Kan. 2016)).

[73] *Modern Air Conditioning, Inc.*, 596 P.2d at 823.

[74] *Kansas ex rel. Six v. Kan. Lottery*, 186 P.3d 183, 191 (Kan. 2008).

Operation likewise does not imply absolute control, especially in the business context."[75]  Here, even though the Consulting Agreement generally disclaims HMG Services' control, it allowed HMG Services to "make or install or cause to be installed, at [Tanglewood's] expense and in the name of [Tanglewood], any proper repairs, replacements, additions, and improvements in and to the Facility and the furnishings and equipment."[76]  Additionally, the Consulting Agreement provides that the facility's bank accounts are maintained by HMG Services.[77]

Second, there is a question about the degree to which Defendants shared expenses, profits, and losses.  It is uncontroverted that HMG Services provided the accounting and billing services for Tanglewood, and maintained its records.  It prepared Tanglewood's operating budget and, despite the Consulting Agreement's contrary provision, Culp testified that it had approval authority over the Administrator's budget changes.  Likewise, while the Consulting Agreement provided that it maintained all of the bank accounts and that both parties could write checks on behalf of the facility, Bigham testified at deposition that he did not have access to the checkbook for the facility.  Finally, Plaintiff points to the provision in the Consulting Agreement that HMG Services is paid 5% of the facility's net revenue each month, in addition to other monthly fees.  Thus, "defendants shared a common interest in the pecuniary success of [the facility].  This is a factor that weighs in favor of finding a joint venture."[78]

There is a genuine issue of material fact on the third factor—whether there is community of control over and active participation in the management and direction of the facility.  Viewing

---

[75] *Id.* at 190 (citation omitted).

[76] Doc. 57-1 § 2.12.

[77] *Id.* § 2.15.

[78] *Keller v. Diversicare of Council Grove, LLC*, No. 23-2556-ADM, 2025 WL 764639, at *7 (D. Kan. Mar. 11, 2025).  Indeed, "Modern Air Conditioning does not require shared profit or apportioned profit but simply anticipated profit for the business enterprise."  *Underground Vaults & Storage, Inc. v. Cintas Corp.*, 632 F. App'x 917, 921 (10th Cir. 2015).

the evidence in the light most favorable to Plaintiffs, HMG Services exercised control over the employees, policies and procedures, finances and budget, personnel decisions, regulatory compliance, and legal matters. Indeed, the same individual signed the Consulting Agreement on behalf of both parties. The Court agrees that such evidence weighs in favor of finding a joint venture.

The fourth factor considers the intention of the parties. There is a genuine issue of disputed fact about what the parties intended. As discussed above, the disclaimer in the Consulting Agreement is not dispositive. Plaintiffs also cite Defendants' corporate leadership structure, the fact that Daspit is both the CEO of Tanglewood and the CFO of HMG Services, and the provisions in the Employee Handbook that prevent employment by related Tanglewood facilities in the event an employee is terminated. The Court agrees that this evidence suffices to create a genuine issue of material fact on the parties' intent.

Under the fifth and final factor, there is no clear evidence about whether salaries were fixed by joint agreement. Plaintiffs point to Bigham's testimony that he was provided a financial incentive as part of his compensation plan that was tied to the facility's census, and that Tanglewood's Director of Nursing won an award from HMG Services for having the lowest return to acute care. But this evidence does not necessarily demonstrate a joint agreement about fixing salaries. This factor is therefore neutral, or weighs against a finding of joint venture.

In sum, there are genuine issues of material fact about almost all of the relevant factors the Court must consider when determining whether a joint venture exists. HMG Services offers almost no discussion about these factors, and failed to file a reply brief addressing Plaintiffs' evidence of the same. The Consulting Agreement's disclaimers are insufficient, standing alone, to show there is no joint venture.

Accordingly, HMG Services' motion for summary judgment on the issue of whether it owes a duty of care to Mr. Bloomer is denied.  There is sufficient evidence to support its duty of care under either a Restatement or joint venture theory of liability.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant HMG Services, LLC's Motion for Summary Judgment (Doc. 56) is **denied**.

**IT IS SO ORDERED.**

Dated: August 22, 2025

<div style="margin-left:40%;">

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

</div>